IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER HAPLEA, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| PLUMSTEADVILLE PUB, LLC, *et al* | : | No. 23-01117-PAC |
| Defendants. | : | |

**MEMORANDUM OPINION**

**PAMELA A. CARLOS**  October 24, 2024
**U.S. MAGISTRATE JUDGE**

Presently before the Court is Plaintiff Christopher Haplea's Motion for Partial Summary Judgment against his former employers in which he argues that he is entitled to judgment as a matter of law on several wage and hour violations brought pursuant to the Fair Labor Standards Act ("FLSA") and Pennsylvania Minimum Wage Act ("PMWA"). Relevant to the instant Motion, Plaintiff alleges that Defendant Plumsteadville Pub, LLC d/b/a Plumsteadville Pub failed to properly compensate him for overtime hours spent working as a bartender and illegally withheld tips he was due in order to compensate other non-tipped employees. He further alleges that the Pub's owner, Defendant John Kelly, is personally liable for these violations.

For the reasons that follow, Plaintiff's Motion is granted in part and denied in part.

**I.      BACKGROUND**

    **A.  Factual Background**

Plaintiff Christopher Haplea ("Plaintiff" or "Haplea") was employed by Defendant Plumsteadville Pub, LLC d/b/a Plumsteadville Pub ("Defendant Pub") beginning in June 2022 first as a barback, and later as a bartender. *See* Doc. No. 41-1 at ¶ 5; Doc. No. 44 at ¶ 5. Defendant Pub

is owned by Defendant John Kelly and his spouse Andrea Kelly ("Ms. Kelly"). *See* Doc. No. 41-1 at ¶ 6; Doc. No. 44 at ¶ 6. In this role, Defendant Kelly had authority to hire, terminate, and discipline employees of Defendant Pub. Further he had control over the terms and conditions of Haplea's employment, including the authority to set his and other employees' rates of pay. *See* Doc. No. 41-1 at ¶¶ 7-9; Doc. No. 44 at ¶¶ 7-9.

As a bartender, Haplea was paid $5.00 per hour by Defendant Pub. He also received tips from patrons, and therefore was considered a "tipped employee" under the FLSA. *See* Doc. No. 41-1 at ¶ 14; Doc. No. 44 at ¶ 14. Haplea maintains that he "often worked greater than 40 hours in a seven-day period, and was not always paid overtime when that occurred." *See* Doc. No. 41-1 at ¶ 15. In fact, Defendant Pub's own timecard records confirm this assertion, *see* Doc. No. 41-1 at ¶¶ 19, 21-24, 26,[1] and Defendants have already conceded as much. *See* Doc. No. 41-1 at ¶ 16 (citing Defendants' Answer, Doc. No. 25 at ¶ 27). Indeed, according to Haplea, Defendants have admitted that there were weeks where he was not paid for time over 40 hours worked due to limitations with the Pub's payroll system. *See* Doc. No. 41-1 at ¶ 17 (citing JA 307-308).

Defendants, however, dispute Plaintiff's characterization. *See* Doc. No. 44 at ¶ 15-16. Although Defendants admitted that "Plaintiff had worked in excess of 40 hours per week," they denied that such work was "often" and "that Plaintiff was not paid in the full amount required by law for any hours worked in excess of 40 hours per week." *See* Doc. No. 25 at ¶ 27. Indeed, Defendants maintained that Haplea admitted he has no basis for his claim. Citing Plaintiff's deposition testimony, Defendants noted that when asked "[o]n how many occasions did you work in excess of 40 hours per week," Haplea responded, "I do not recall." *See* Doc. No. 44 at ¶ 15

---

[1] For example, Mr. Haplea noted that between November 7, 2022 to November 13, 2022, Defendants' timecard records demonstrate that he worked 46.567 total hours. *See* Doc. No. 41-1 at ¶ 19 (citing JA 558-578).

(citing JA 89-90). Haplea further confirmed that he had not attempted to calculate how many overtime hours he might have worked and did not keep any records regarding the same. *Id.* Moreover, Defendants suggested that any purported issues with their payroll system were accounted for by paying employees in cash or check payments. *See* Doc. No. 44 at ¶ 17-18.[2] However, Defendants concede that they did not maintain any records confirming that these cash or check payments were issued. *See* Doc. No. 44-1 at 7 ("Defendants conceded that they were deficient in their record keeping.").

Haplea further contends that Defendants implemented an illegal tipping policy whereby tipped bartenders were asked to give ten percent of their tips to the cook staff, who were not tipped employees, at the close of each shift. *See* Doc. No. 41-1 at ¶ 27. This tipping policy went into effect in the beginning of January 2023. *See id.* (citing JA 158-159, 299-301). Nicole Staniszewski ("Ms. Staniszewski"), a former daytime manager and Haplea's supervisor, *see* Doc. No. 41-1 at ¶ 10; Doc. No. 44 at ¶ 10,[3] communicated this policy to the Defendant Pub's bartenders via text message as set forth below:

> Hey guys! As the new year is approaching I'd like to talk about a couple of things that me, ange and butch talked about. Starting this Sunday the first we will have a bag in the safe that says cooks and everyday from am shift and pm shift we'd like you to give 10% of your tips to them. They do a lot of things for all of us take our trash out, dishes, ice etc and they should be compensated for that. We're all a team and it will make them feel more appreciated if they are thought of that way. Also starting this Sunday if you'd like a sandwich or something to eat during your shift you may comp it. If anyone has any questions feel free to text me outside the group. Thank you

---

[2] Defendants further note that Ms. Kelly specifically addressed instances where a payroll shortfall occurred when communicating with the Pennsylvania Department of Labor. *See* Doc. No. 44 at ¶ 18. In an email dated March 30, 2023, Ms. Kelly wrote, in relevant part, "My notes will also explain that the extra hours were paid to the employee but I used a Pub check or cash. I now understand that you require these hours be paid by payroll, and I will make that correction." *See id.* (citing JA 429).

[3] Ms. Staniszewski was last employed by Defendants in July 2023. *See* Doc. No. 44 at ¶ 27.

*See* Doc. No. 41-1 at ¶ 34 (citing JA 351-353) (verbatim, with typographical errors).[4] To effectuate this policy, Defendant Pub provided blue envelopes marked "cooks" for the bartenders to place their nightly contributions. *See* Doc. No. 41-1 at ¶ 36.

In March of 2023, Haplea notified Defendant Kelly that he left zero dollars or only a few dollars for the cooks, intimating that he took issue with the policy. *See* Doc. No. 41-1 at ¶ 37 (citing JA 161-162). In this regard, Defendant Kelly testified as follows:

> The first time that I had actually had anybody say anything about it [the tipping policy] to me was Chris [Haplea]. And at first, he apparently loved it, and then two months – you know, starting end of February, early March, you know, there was a few occasions where he told me he left five dollars and then he left zero dollars and then the one time he left two dollars. That was on three different occasions.
>
> And I told him, you know, its pretty much a voluntary gesture thing; you know, I just moved on to something else. You know, I did go back and look, and he did get his free meals and drinks. But, you know, he only left, you know, for whatever reason, I don't even know why, five, zero, and three dollars on three different occasions. And that was in, I'm pretty sure March.

*See* JA 162 (verbatim, with typographical errors).

Defendant Kelly notified his spouse that Haplea was leaving less than the suggested ten percent amount for the cook staff. *See* Doc. No. 41-1 at ¶ 38 (citing JA 314). Following this, in March of 2023, Ms. Kelly texted several of the Defendant Pub's employees regarding the policy:

> It upsets me to even have to send this message, but apparently there is some confusion as to why we are tipping out our cooks. This has been something Butch and I have discussed for a while and finally put into place, you all know the business, and you all know there can be bad days and there can be really good days. For our cooks, there are only 2, they work 50-60 hours a week and are on their feet 10-12 hours/day with no one to talk to down there half the shift. They clean, they prep, they order, they cook and many times they help the bar when they have some down time. By no means, did Butch and I think the cooks should be doing the bartenders jobs, to earn a mere 10% of tips, it was put in place because they are part of your team, they help the shift run smoothly and they play a huge part in satisfying

---

[4] Defendants dispute Plaintiff's characterization of this text message as establishing a "mandatory" tip pool, or that it was illegal. *See* Doc. No. 44 at ¶ 27, 34. But they do not dispute that this text message was sent or otherwise question its authenticity.

>customers by putting out good food (do mistakes happen, absolutely, and it's up to you to relay that back to them and for them to correct it) I honestly could go on about how I feel about this, but it order to wrap it up, please see me and/or Butch with ANY concerns. I apologize for not making this more clear from the beginning, but we are not tipping them to do the bartenders job, we are tipping them for the job they do each and every day. I do not expect them to take out our trash, or fill our ice or other things, sometimes they do that as a courtesy. If they are on their phone, then their prep, cooking or cleaning is done, they deserve a break throughout a 8-12 hour day.

*See* Doc. No. 41-1 at ¶ 39 (citing JA 354-357) (verbatim, with typographical errors).

At some point after receiving this message, Haplea filed a complaint with the Pennsylvania Department of Labor on March 15, 2023. *See* Doc. No. 41-1 at ¶ 45; Doc. No. 44 at ¶ 45; *see also* JA 415-468 (materials concerning the Department of Labor investigation). As part of its investigation into Haplea's allegations, Investigator Emanuel Morales ("Mr. Morales") contacted Defendant Kelly and Ms. Kelly by phone and email over the course of several months. In relevant part, Ms. Kelly emailed Mr. Morales on July 13, 2023 regarding Defendant Pub's tipping policy:

>Regarding the issue of tipping the back of the house (cooks), you notified us that this was against Pa law, so we immediately advised the staff of this and no longer tipped the cooks. It was a voluntary act, and we (John and Andrea) returned any money that was relinquished by the tipped staff… Each employee stated that they received more than what they contributed and did not want the money, but we advised them to cash the checks to correct the error we made.

*See* JA 433 (verbatim, with typographical errors). This message, though partially redacted, further indicated that "Check #4340" was issued to "Chris H" (Haplea) in the value of $630.00, but it was not cashed as of the date of the email. *See id.* Photocopies of these checks, including one set aside for Haplea, was separately emailed to Mr. Morales. *See* JA 442 (noting Haplea's check was dated March 24, 2023). However, Defendants never mailed this check to Haplea, or otherwise informed him that one had been issued. *See* Doc. No. 41-1 at ¶ 31.[5]

---

[5] In their Response in Opposition, Defendants dispute Plaintiff's factual allegation as to this issue. *See* Doc. No. 44 at ¶ 31. In doing so, however, Defendants cite to Ms. Kelly's deposition testimony where she appears to corroborate this assertion. The cited testimony is as follows: "I

5

As noted above, Ms. Kelly represented to the Department of Labor that Defendant Pub discontinued the tipping policy after being notified it was against Pennsylvania law. *See* JA 433. Defendant Kelly corroborated this during his deposition, explaining, "[a]fter we realized it [the tipping policy] was illegal, we went back through . . . and tried to figure out the best we could of what they [the bartenders] possibly put in this tip thing and reimbursed everybody." *See* Doc. No. 41-1 at ¶ 28 (citing JA 180). Despite this, Defendants maintain in their Response brief that nothing about the tipping policy was "mandatory." *See* Doc. No. 44 at ¶ 27. To the contrary, Defendant Kelly testified that the policy had been intended as a "voluntary gesture thing," and no one besides Haplea objected to it. *See id.* (citing JA 161-162). Ms. Staniszewski also explained that the policy was not mandatory, no other bartender ever complained to her about it, and each bartender could contribute as much (or as little) as they wanted for the cooks. *See id.* (citing JA 352-353, 385, 388-390). Haplea, and several other bartenders, confirmed that no one at Defendant Pub monitored the amount being contributed. *See id.* (citing JA 52-54) (where Haplea agreed that the determination of tip amounts for the cooks was on an "honor system.").[6]

Following Plaintiff's complaint with the Department of Labor, Haplea contends that he texted Ms. Kelly, thus prompting Defendant Kelly to call and inform him that he was being terminated. *See* Doc. No. 41-1 at ¶ 46 (citing JA 81, 120-121). Defendants, however, dispute

---

didn't have Chris' address at the time so this [the check] went under the register. I didn't feel comfortable contacting his [sic] since we're supposedly not supposed to talk to him so – that [sic] where it lies still to this day, under the register." *See* Doc. No. 44 at ¶ 31 (citing JA 318-319). After explaining this, Ms. Kelly was asked whether she ever gave the check to her attorney to give to Haplea, and she responded, "I did not." *See* JA 319. When asked once more whether the check had been cashed by Haplea or anyone else, Ms. Kelly testified, "It's still under the register in an envelope with his name." *See* JA 319-320.

[6] Defendants also cited to the deposition testimony of five other bartenders—Amber Perkins, Andrew Kijanski, Michelle Banner, Sheri Thompson, and Stacey Magro—to support their assertion that no one at Defendant Pub monitored the tip amounts being contributed. *See* Doc. No. 44 at ¶ 27 (citing JA 664, 675-677, 696, 703-705, 778, 792-794, 862, 880-882, 896, 913-915).

Haplea's characterization of this phone call. *See* Doc. No. 44 at ¶ 47. Instead, Defendant Kelly believed Haplea voluntarily discontinued his employment with Defendant Pub after filing a complaint with the Department of Labor. *See* Doc. No. 41-1 at ¶ 52; Doc. No. 44 at ¶ 52. Haplea did not show up for work for his regular shift on March 16, 2023, or any time thereafter. *See* Doc. No. 41-1 at ¶ 53; Doc. No. 44 at ¶ 53.

### B. Procedural History

Shortly after filing the Pennsylvania Department of Labor complaint, Haplea initiated this lawsuit on March 22, 2023 alleging several violations of the FLSA (Count I) and PMWA (Count II) including that he was not paid overtime compensation and that he was wrongfully terminated in retaliation for engaging in protected conduct. *See* Doc. No. 1. On June 5, 2023, Defendants moved to dismiss the Complaint, *see* Doc. No. 10, thus prompting Haplea to file an Amended Complaint. *See* Doc. No. 11. The Amended Complaint still alleged that Haplea was not properly compensated for overtime work and wrongfully terminated under the FLSA and PMWA (Counts I and II). *See id.* at ¶¶ 33-40. However, he added an additional claim against Defendant Kelly (Count III) alleging that Defendant Kelly continued to intimidate and retaliate against him for engaging in protected conduct even after his employment with Defendant Pub ended. *See id.* at ¶¶ 29-30, 41-46.

On June 30, 2023, Defendants filed a Second Motion to Dismiss, *see* Doc. No. 16, which was granted in part, and denied in part. *See* Doc. Nos. 19, 20.[7] In a memorandum opinion, Judge Lloret rejected Defendant Kelly's attempt to limit his individual liability under the FLSA and the PMWA, and further explained that Haplea was entitled to seek punitive damages and damages for

---

[7] On June 29, 2023, the Parties consented to jurisdiction by a U.S. Magistrate Judge, and the matter was reassigned to Judge Richard A. Lloret to conduct all remaining proceedings. *See* Doc. Nos. 13, 14.

pain and suffering. *See* Doc. No. 19 at 4-8. However, Judge Lloret determined that Haplea failed to allege that his employment prospects have been harmed due to the alleged conduct of Defendant Kelly in support of Count III of the Amended Complaint. *See id.* at 8-11. Accordingly, Count III was dismissed without prejudice. *See* Doc. Nos. 19, 20. Defendants thereafter filed their Answer to the Second Amended Complaint denying all liability. *See* Doc. No. 25.

Following discovery, Haplea filed the instant Motion for Partial Summary Judgment on April 23, 2024. *See* Doc. No. 41.[8] He argued that Defendants admitted in this litigation that they implemented an illegal tipping policy and owe money to him and that they did not always pay overtime when he worked more than 40 hours in multiple pay periods. *See id.* at 6. Haplea explained that Defendants' own pay records, while limited and often incomplete, confirmed that he was not paid for overtime hours spanning several weeks. *See id.* at 7-13.[9]

On May 21, 2024, Defendants filed their Response in Opposition to Plaintiff's Motion, arguing there are genuine issues of material fact that must be submitted to trial for determination by a fact finder. *See* Doc. No. 44-1 at 4. With respect to Plaintiff's overtime claim, "Defendants conceded that they were deficient in their record keeping." *See id.* at 7. Nevertheless, Defendants explained that Haplea's own deposition testimony confirmed that he had no basis to establish whether he was paid for any overtime hours he may have worked, and therefore, he failed to shift the burden to Defendants as to this issue. *See id.* at 6-7. Defendants also vehemently disputed Haplea's claim that they "admitted" to implementing an illegal tip pool on staff bartenders. *See id.* at 7-9; *see also* Doc. No. 44 at 7 ("Contrary to that which is alleged by Plaintiff herein, none of

---

[8]   Page references to Plaintiff's summary judgment motion throughout this Memorandum Opinion refer to the court-stamped numbers located in the header of each page—not to page references included by Plaintiff in the footer.

[9]   On May 16, 2024, the matter was reassigned from Judge Lloret to the undersigned to conduct all remaining proceedings. *See* Doc. No. 43.

the enumerated statements of Defendants amounts to an admission that Defendants initiated and enforced a mandatory illegal tipping policy. The only source of that information is Plaintiff"). According to Defendants, Section 203(m) of the FLSA limits participation in "mandatory" tip pools, and there is no evidence in the record to support Haplea's claim. *See* Doc. No. 41-1 at 7-8. Defendants maintain that there was no obligation for any bartender to participate in the tip pool, and it was a "mere gratuity, which if not followed, carried no consequence." *See id.* at 8.

On June 4, 2024, Plaintiff filed his Reply to Defendants' opposition brief, repeating his position that he is entitled to judgment as a matter of law. *See* Doc. No. 46. Haplea explained that it is irrelevant whether he could personally remember instances in which he worked over 40 hours because Defendants' own records establish this fact. *See id.* at 2. Moreover, Defendants failed to produce *any* records confirming that Haplea was paid in cash, or any other manner, for his overtime work, and it was their duty to maintain such records. *See id*. at 2-4. With respect to the illegal tipping policy, Haplea explained that the record confirms that Defendants' tipping policy was "initiated, organized, and implemented by Defendant's management," and that Defendant Kelly himself admitted in his deposition that the policy was illegal. *See id.* at 5-6. Finally, Haplea further rebutted the Defendants' claim that no bartenders were ever disciplined for failing to participate in the tip pool, explaining that only he ever expressed an issue with the policy, and he was retaliated against for having done so. *See id.* at 6

The matter is now ripe for disposition.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only in cases where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those that "might affect the outcome of the suit

9

under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). At the summary judgment stage, the facts and evidence are viewed in "the light most favorable to the nonmoving party." *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

The moving party has the initial burden of showing an absence of a genuine dispute as to any material fact. *See Anderson*, 477 U.S. at 256. This includes any argument that there is no evidence to support an essential element of the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). After the movant has made this initial showing, the burden then shifts to the nonmoving party to demonstrate that there is sufficient evidence in the record that would support a jury verdict in their favor. *See id.* at 322–23. Importantly, speculation and conclusory allegations by the nonmoving party are not enough to defeat a summary judgment motion. *Razak, Inc.*, 951 F.3d at 144.

### III. DISCUSSION

#### A. Plaintiff's Overtime Claims

Starting first with Haplea's overtime claims, the undersigned agrees that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law.

Section 206 of the FLSA requires employers to pay covered employees a minimum wage of at least $7.25 per hour for each hour worked. *See* 29 U.S.C.A. § 206(a). Under some circumstances and by complying with the provisions of Section 203(m), employers may lawfully pay "tipped employees" a lesser amount and supplement that payment with tips to reach the minimum wage. *See Pizzella v. Diner*, No. CV 18-4663, 2021 WL 1649517, at *4 (E.D. Pa. Apr. 27, 2021), *aff'd sub nom. Sec'y United States Dep't of Lab. v. Mosluoglu, Inc.*, No. 22-2749, 2023 WL 5972044 (3d Cir. Sept. 14, 2023). This arrangement is frequently referred to as a "tip credit." *See* 29 U.S.C.A. § 203(m). Under the FLSA a "tipped employee" means "any employee engaged

in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C.A. § 203(t).[10]

Regardless of an employee's status as a "tipped employee," the FLSA "forbids an employer from employing any worker 'for a workweek longer than forty hours unless such employee receives compensation . . . at a rate not less than one and one-half times the [employee's] regular rate' for the excess hours.'" *See Pizzella*, No. CV 18-4663, 2021 WL 1649517, at *5 (quoting 29 U.S.C.A. § 207(a)(1)). "Where an employer takes a tip credit, overtime is calculated based on the full minimum wage (i.e., $7.25 per hour), not on the lower direct (or cash) wage payment." *Id.* (citing 29 C.F.R. §§ 531.60, 778.5 (2020)).

"When an employee brings a claim under the FLSA, he ordinarily bears 'the burden of proving that he performed work for which he was not properly compensated.'" *Rosano v. Twp. of Teaneck*, 754 F.3d 177, 188 (3d Cir. 2014) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). Because the FLSA imposes upon employers the duty to keep and maintain records of the "wages, hours, and other conditions and practices" of its employees, plaintiff-employees traditionally satisfy this burden "by securing the production of those records." *Id.* (citing *Anderson*, 328 U.S. at 687); *see also* 29 U.S.C.A. § 211(c) (explaining employers "shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him…"). However, where an employer fails to maintain proper records, the employee's burden is lessened, and they "will only

---

[10]   "The PMWA similarly establishes a minimum wage for employees in Pennsylvania, one that is tethered to the minimum wage set by the FLSA." *Rui Tong v. Henderson Kitchen Inc.*, No. CV 17-1073, 2018 WL 4961622, at *3 (E.D. Pa. Oct. 12, 2018). Given the "substantial parallel between the two statues' minimum wage provisions, federal courts are directed to interpret the FLSA when analyzing claims under the PMWA." *Id.* (citing *Razak v. Uber Tech., Inc.*, No. 16-573, 2016 WL 5874822, at *7 (E.D. Pa. Oct. 7, 2016)).

be required to 'submit sufficient evidence from which violations of the [FLSA] and the amount of an award may be reasonably inferred.'" *Id.* (citing *Anderson*, 328 U.S. at 688). Indeed, our Court of Appeals explained:

> In the absence of adequate employer records of employees' wages and hours, as required by the FLSA, the solution is not to penalize the employees by denying recovery based on an inability to prove the extent of undercompensated work, but rather to allow the employee . . . to submit sufficient evidence from which violations of the Act and the amount of an award may be reasonably inferred.

*Martin v. Selker Bros.*, 949 F.2d 1286, 1297 (3d Cir. 1991) (citation omitted). "Once this inference is created, the burden shifts to the employer to rebut that inference." *Rosano*, 754 F.3d at 188.

Discovery in this litigation has confirmed several facts. First, there is no dispute that Defendant Pub paid Plaintiff $5.00 per hour to work as a bartender, that in this role he received tips from the Defendant Pub's patrons, and that Defendants considered him, and other bartenders, to be "tipped employees" under the prevailing wage and hour laws. *See* Doc. No. 41-1 at ¶ 14; Doc. No. 44 at ¶ 14. The Parties also agree that at least on some occasions, Haplea worked greater than 40 hours in a seven-day period, and therefore, was entitled to overtime pay. *See* Doc. No. 41-1 at ¶ 15; Doc. No. 25 at ¶ 27 (wherein Defendants admitted in their Answer that "Plaintiff had worked in excess of 40 hours per week …"). Indeed, Defendant Pub's timecard records across several pay periods confirm as much and demonstrate that Haplea worked more than 30 hours of "overtime." *See* Doc. No. 41-1 at ¶¶ 19, 21, 22, 23, 24, 26 (citing JA 562, 560-561, 562-563, 564-565).

The Parties, however, disagree over one basic issue—*i.e.*, whether Haplea was properly compensated for this overtime work. On this discrete question, Plaintiff has submitted more than sufficient evidence to satisfy his burden. As explained above, Defendant Pub's own timecard records confirm that Haplea worked more than 40 hours per week over several pay periods. Plaintiff further explained that "[a] review of the pay records produced by Defendants in this

12

litigation . . . show that Haplea was not paid for any of these overtime hours." *See* Doc. No. 41 at 10 (citing JA 579-587). Indeed, Plaintiff noted that Defendant Pub's payroll register automatically maxed out hours worked at 80, thereby depriving him of overtime pay he was due. *See* Doc. No. 41 at 12-13 (citing JA 564-565 and JA 582) (showing that from February 6, 2023 to February 20, 2023 the payroll register indicated that Haplea was credited for 80 hours worked, whereas timecard records showed 83.47 total hours worked).

Defendants, for their part, concede that they were deficient in their record keeping, and that there were issues with their payroll company. *See* Doc. No. 44-1 at 7. Nevertheless, they oppose summary judgment arguing that this deficiency does not impute *per se* liability. *See id*. In this regard, Defendants argue that Haplea's deposition testimony demonstrates that he "has no basis to determine if he was paid for any overtime hours that he may have worked." *See id.* at 6. When asked "[o]n how many occasions did you work in excess of 40 hours per week," Plaintiff responded, "I do not recall." *See* Doc. No. 44 at ¶ 15 (citing JA 89-90). Haplea further testified that he had not attempted to calculate how many overtime hours he might have worked and did not keep any records regarding the same. *Id.* Next, Defendants argue that Ms. Kelly, Defendant Pub's co-owner, explained to the Pennsylvania Department of Labor that "although she did not know that she could not pay cash for hours that were not paid for by Defendants' payroll company, she did make payment by way of other means …" *See* Doc. No. 44-1 at 7 (citing JA 429). In other words, Defendants suggest, without directly arguing as much, that Haplea was compensated for his overtime work via cash or some other form of payment. Given this, Defendants argue "[w]ith no records or any other means to determine whether he was paid, a justiciable issue is clearly established," and summary judgment must be denied. *See id.*

13

But these arguments are without merit. It was Defendants'—not Plaintiff's—duty to maintain basic records concerning his wages, hours, and other conditions of employment. Of the limited records that Defendants did produce, these unambiguously demonstrate that for several weeks Haplea worked more than 40 hours but was not paid for this time through Defendant Pub's payroll company. To the extent Defendants paid Haplea or other employees, in cash or by check, it was their duty to maintain and produce records of the same. They did not. Under these circumstances, the burden fell squarely on Defendants to rebut Plaintiff evidence, but they failed to do so.

In his Reply, Plaintiff correctly explains that "[o]n summary judgment the non-movant must rebut the movant's motion by identifying 'some evidence in the record that creates a genuine issue of material fact.'" *See* Doc. No. 46 at 2 (citing *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)). "In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd.*, 455 F.3d at 201. Plaintiff also correctly explains, that despite this, "Defendants only vaguely argue that there were occasions when they paid Mr. Haplea in 'cash'." *See* Doc. No. 46 at 2-3. Indeed, as far as the undersigned can best tell, Defendants rely most heavily on an email sent by Ms. Kelly to the Pennsylvania Department of Labor to create a justiciable issue. *See* Doc. No. 44-1 at 7 (citing JA 429). But this is insufficient. The statements contained in this email do not explicitly state that Haplea was paid for specific time (or in specific amounts) and instead responded in only general terms to Haplea's complaint with the Department of Labor.

14

Defendants have not produced declarations, or pointed to deposition testimony, where they expressly address Haplea's disputed hours, and establish that payments were made.[11]

Given this, the Court holds that Plaintiff is entitled to summary judgment against Defendant Pub and Defendant Kelly on his unpaid overtime FLSA and PMWA claims. *See Walsh v. La Tolteca Wilkes Barre, Inc.*, No. 3:21-CV-1628, 2023 WL 8458238, at *18 (M.D. Pa. Dec. 6, 2023) (granting plaintiffs' motion for summary judgment with respect to their overtime claims, noting that "Defendants consistently failed to maintain adequate records under the FLSA," and "failed to record the number of hours worked or the hourly rate."); *Su v. CareCo Shoreline, Inc.*, No. 3:21-CV-00401 (VAB), 2023 WL 2743132, at *7 (D. Conn. Mar. 31, 2023) (granting summary judgment to the Department of Labor on overtime payment claim, nothing that defendant-employer's own timekeeping and payroll records confirmed that employees were not properly compensated for overtime work); *see also Ramirez v. Riverbay Corp.*, 35 F. Supp. 3d 513, 528–29 (S.D.N.Y. 2014) ("[Plaintiff] accrued hours that were not compensated at the statutorily required overtime rate in at least one given week during which she worked more than forty hours. This is enough to establish liability."). All remaining issues concerning the extent of damages and any other remedial matters will be addressed at a later date.[12]

---

[11]   Even if such declarations were provided, the Third Circuit has held that "conclusory self-serving affidavits are insufficient to withstand a motion for summary judgment." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) (citation and quotes omitted).

[12]   At the motion to dismiss stage, this Court already concluded that under the FLSA and PMWA, Defendant Kelly could be held individually liable for his actions. *See* Doc. No. 19 at 4-5 (citing *Thompson v. Real Est. Mortg. Network*, 748 F.3d 142, 153 (3d Cir. 2014) *and Scholly v. JMK Plastering, Inc.*, No. 07-4998, 2008 WL 2579729, at *4 (E.D. Pa. June 25, 2008)). As noted by Judge Lloret in his Memorandum Opinion, "Defendants concede[d] that Mr. Kelly is an 'employer' under the FLSA," and instead argue[d] that "FLSA's individual liability provisions do not apply to a business the size of" Defendant Pub." *See id.* at 5. But Judge Lloret rejected this argument noting that neither the FLSA nor the PMWA specifically limits liability to employers who employ more than a certain number of employees, and that Defendants have not identified any caselaw to suggest otherwise. *Id* at 5-6.

15

### B. Plaintiff's Unpaid Tips Claims

Turning next to Haplea's claim concerning Defendant Pub's tipping policy, the undersigned finds that summary judgment is not warranted on this record.

"There are strict requirements an employer must follow in order to claim the tip credit in conformance with § 203." *Rui Tong v. Henderson Kitchen Inc.*, No. CV 17-1073, 2018 WL 4961622, at *6 (E.D. Pa. Oct. 12, 2018). These include first, that that the employer informs the employee that a tip credit is being utilized and its amount; next that the employee makes tips equaling the tip credit amount; and last, that the employee retains all tips collected. *See* 29 C.F.R. § 531.59. "An employee's tips may be taken to contribute to a valid tip pool, *which may only include those employees who customarily and regularly receive tips*, and again the employer must notify its employees of any required tip pool contribution amount and not retain the tips for any other purpose." *Rui Tong*, 2018 WL 4961622, at *6 (citing 29 C.F.R. § 531.54) (emphasis added).[13] In the restaurant setting, "chefs are one of the classic examples of those with whom tipped employees cannot be required to share tips." *Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186, 191 (5th Cir. 2015) (citing Department of Labor Handbook § 30d04(c)); *see also Walsh v. Dayemi Org., Inc.*, 608 F. Supp. 3d 715, 722 (S.D. Ill. 2022) ("Because § 203(m) limits participation in mandatory tip pools to employees who 'customarily and regularly receive tips', a

---

Now, at the summary judgment stage, Defendants do not dispute that Defendant Kelly and his spouse co-owned Defendant Pub, and in this role, Defendant Kelly had control over the terms and conditions of Haplea's employment, including the authority to set his and other employees' rates of pay. *See* Doc. No. 41-1 at ¶¶ 6-9; Doc. No. 44 at ¶¶ 6-9. Indeed, Defendants did not oppose Haplea's claim that Defendant Kelly is also individually liable for Defendant Pub's wage and hour violations. Given this, judgment is entered in Haplea's favor as against both Defendants.

[13]   Again, "Pennsylvania law is in accord with the FLSA." *Rui Tong*, 2018 WL 4961622, at *6 (citing 43 Pa. Stat. Ann. § 103(d); 34 Pa. Code § 231.101; *Calabrese v. TGI Friday's Inc.*, No. 16-0868, 2017 WL 5010030, at *3-4 (E.D. Pa. Nov. 2, 2017)).

16

valid tip pool generally does not include employees who do not customarily and regularly receive tips, such as dishwashers, cooks, chefs, and janitors.").

As explained above, there is no dispute that Defendant Pub regarded Haplea and its other bartenders as "tipped employees" under the prevailing wage and hour laws. *See* Doc. No. 41-1 at ¶ 14; Doc. No. 44 at ¶ 14. Discovery further confirmed that in January of 2023, Defendant Pub implemented a practice whereby bartenders were asked to give ten percent of their tips to kitchen staff members at the close of each shift, and bartenders were notified of this practice via text message by former daytime manager, Nicole Staniszewski. *See* Doc. No. 41-1 at ¶¶ 27, 34 (citing JA 158-159, 299-301, 351-353). Defendant Pub communicated this practice once more in March of 2023 via a text message sent by Ms. Kelly. *See* Doc. No. 41-1 at ¶ 39 (citing JA 354-357). To effectuate this policy, Defendant Pub provided blue envelopes marked "cooks" for the bartenders to place their nightly contributions. *See* Doc. No. 41-1 at ¶ 36.

There also is no dispute that following Haplea's complaint with the Pennsylvania Department of Labor, Defendant Pub discontinued the practice and took steps to remedy any perceived wrongdoing. For example, in an email dated July 13, 2024, Ms. Kelly notified the Department of Labor that once they were told that the policy violated Pennsylvania law, "we [Defendant Pub] immediately advised the staff of this and no longer tipped the cooks." *See* JA 433. This email further confirmed that Defendant Pub's owners "returned any money that was relinquished by the tipped staff," and Ms. Kelly provided photographs of checks that were issued to each employee. *See id.* Defendant Kelly corroborated this during his deposition, explaining, "[a]fter we realized it [the tipping policy] was illegal, we went back through . . . and tried to figure out the best we could of what they [the bartenders] possibly put in this tip thing and reimbursed everybody." *See* Doc. No. 41-1 at ¶ 28 (citing JA 180). A check in the value of $630.00 was set

aside for Plaintiff, but was never provided to him. *See* JA 319-320, 442; Doc. No. 41-1 at ¶ 31. Given these admissions, Haplea contends that he is entitled to judgment as matter of law and is due the $630.00 set aside by Defendants in illegally withheld tips. *See* Doc. No. 41 at 10.

Defendants, however, oppose summary judgment arguing that there are several issues of material fact that must be submitted to a fact finder for determination. First, Defendants insist that "none of the enumerated statements of Defendants amounts to an admission that Defendants initiated and enforced a mandatory illegal tipping policy." *See* Doc. No. 44 at 7. According to Defendants, Section 203(m) of the FLSA limits participation in "mandatory" tip pools, and in this regard, the tipping practice described above was a "mere gratitude, which if not followed, carried no consequence." *See id.* at 8. Defendants maintain that there was no obligation for any bartender to participate in the tip pool, and Haplea, together with five other bartenders, confirmed that no one at Defendant Pub monitored the amount being contributed. *See* Doc. No. 44 at ¶ 27 (citing JA 52-54) (where Plaintiff agreed that the determination of tip amounts for the cooks was on an "honor system").[14] Indeed, Defendants note that no bartender was ever disciplined for not contributing to the tip pool, thus negating any inference that it was a mandatory policy. *See* Doc. No. 44-1 at 8.

In his Reply, Haplea argues that "[a] tip pooling policy would be considered voluntary so as to avoid liability only if 'the employee has full control over his/her tips without any recommendations, suggestions, requirements, or implications by management or trainers." *See* Doc. No. 46 at 4 (citing *Mardones v. Samurai, Inc.*, No. 15-21543-Civ, 2018 U.S. Dist. LEXIS 120002, at *11 (S.D. Fla. July 17, 2018)). Given the record evidence, Haplea maintains that Defendants undeniably directed their bartenders to contribute ten percent of their tips to the

---

[14]     As explained in footnote 6 above, Defendants also cited to the deposition testimony of five other bartenders to support their assertion that no one at Defendant Pub monitored the tip amounts being contributed.

cooking staff, they re-affirmed the policy in writing after he complained about it, and they never once conveyed to the bartenders that participation in the same was at all optional. *See id.* at 4-6. According to Plaintiff, these facts, together with Defendants' admissions to the Pennsylvania Department of Labor, demonstrate that there is no genuine dispute of material fact.

At the summary judgment stage, however, the undersigned must view the facts and evidence in "the light most favorable to the nonmoving party." *See Razak*, 951 F.3d at 144. Given this posture, the undersigned agrees with Defendants that there is a triable issue over whether the above-described tipping policy was truly "mandatory." Although a reasonable juror may construe Defendants' statements to the Pennsylvania Department of Labor, or even its actions thereafter, to constitute an admission of wrongdoing, there is ample evidence to the contrary. Defendant Kelly, Ms. Staniszewski, and five other bartenders testified that Defendant Pub never monitored how many tips, if any, were contributed to the disputed tip pool. Indeed, Ms. Kelly's email to the Department of Labor explicitly described the policy as a "voluntary act." *See* JA 433. And while Defendants' communications with the bartenders never explicitly described the tipping policy as "optional" or "voluntary," these same communications also did not describe it as "mandatory" or "required."

In short, while the evidence in Haplea's favor may be strong, when drawing all inferences in Defendants' favor, it is not unreasonable for a juror to conclude that tip pooling in this instance was voluntary. This issue will be resolved at trial.

## IV.      CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment, *see* Doc. No. 41, is granted in part and denied in part. Plaintiff is entitled to judgment as a matter of law with regard to his overtime claims. Any dispute as to the amount of said claims is not presently before this Court. As it concerns Plaintiff's claim regarding illegally withheld tips, the motion is denied. An appropriate Order follows.

BY THE COURT:

*s/Pamela A. Carlos*
PAMELA A. CARLOS
U.S. Magistrate Judge